REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 49

September Term, 2013

AZIZOLLAH ABRISHAMIAN

v.

WASHINGTON MEDICAL GROUP, P.C.

Woodward,
Nazarian,
Kenney, James A., III
        (Retired, Specially Assigned),

JJ.

Opinion by Nazarian, J.

Filed: March 4, 2014

The saga before us in this case began in 2005 with an auto accident, but since has snowballed into litigation about litigation. Azizolah Abrishamian appeals a jury's verdict in the Circuit Court for Montgomery County finding that he breached his contract with appellee Washington Medical Group, P.C. ("WMG") to pay bills for medical treatment WMG provided to him after the accident. Mr. Abrishamian opposed WMG's claims by arguing that his treating physician at WMG, Pedro Macedo, M.D., refused to honor an agreement to testify as an expert on his behalf in the post-accident personal injury lawsuit. Mr. Abrishamian interpreted this refusal as relieving him of his obligation to pay WMG's bills, but WMG disagreed and sued to recover the unpaid balance. Mr. Abrishamian counterclaimed for fraud and breach of contract, and after some fairly complicated (but not really complex) pre-trial wrangling, a jury returned a verdict in favor of WMG. Mr. Abrishamian challenges a number of the circuit court's procedural and evidentiary decisions, and we affirm.

## I. BACKGROUND

Mr. Abrishamian suffered a head injury in his auto accident, and his physician referred him to WMG for treatment. At his first visit to WMG, Mr. Abrishamian signed an Authorization and Assignment Agreement (the "A&A"), in which he agreed to pay WMG's medical bills out of the proceeds of any settlement or judgment he might recover from the lawsuit. Mr. Abrishamian recovered $30,000 in that suit, but never paid any of those proceeds to WMG. Instead, according to WMG, Mr. Abrishamian "filed an interpleader

action in the Circuit Court to dispute the amounts owed to his medical providers." (The record does not contain any of the pleadings or other documents from that litigation.)

On January 11, 2010, WMG filed suit in the District Court for Montgomery County to enforce the A&A, seeking to recover unpaid medical bills totaling $11,510.00, plus interest and attorneys' fees. On November 21, 2011, after discovering that it had received payments shortly after the accident from Mr. Abrishamian's Personal Insurance Protection policy ("PIP") that it mistakenly had failed to apply to Mr. Abrishamian's account, WMG refiled its complaint and reduced the amount in dispute to $4,810.00. For his part, Mr. Abrishamian contends that WMG harbored an ulterior fraudulent motive for filing its initial complaint, and characterizes the trial court's (pretty routine) decision to allow WMG to refile the complaint in dramatic terms:

> [WMG] knowingly and deliberately made the false representation that I owed [WMG] $11,510.00, which I did not. Not only had [WMG] sued me for this crafted amount they had also sued Mr. Edward J. Brown, a fellow bar member, whose only misfortune was that he was my attorney in a different case. After transferring the above-mentioned case to the Circuit Court . . . [WMG] quickly changed course, confessed to the Circuit Court Judge . . . that the $11,510.00 was indeed a false amount and pled for their complaint to be dismissed, which it was. [The trial court] penalized [WMG] by directing [it] to pay all court costs.

After WMG refiled the case in district court, it attempted repeatedly, without success, to serve Mr. Abrishamian and his counsel, Edward Brown. On May 16, 2011, the court entered an order allowing alternative service, and on June 13, 2011, denied Mr. Brown's

2

motion to reconsider that order. The court entered an Affidavit Judgment against Mr. Abrishamian on August 4, 2011, and mailed a Notice of Judgment on August 18, 2011. He claims not to have received either (although he does not argue that the court mailed any documents to the incorrect address). Nevertheless, on September 2, 2011, in a classic failure to communicate,[1] Mr. Abrishamian filed *pro se* a Motion to Vacate the Affidavit Judgment *on the same day* that Mr. Brown's office filed a Motion to Vacate the Affidavit Judgment on his behalf (the latter also included a "request for sanctions"). Both Mr. Abrishamian's Motion and counsel's Motion accused WMG of fraud; Mr. Abrishamian's Motion professed indignation at the notion that anyone might think that Mr. Brown's office represented him.[2]

---

[1] *See* Frank R. Pierson, *Cool Hand Luke* 97 (1966) (The Captain: "What we got here is a failure to communicate. Some men you can't reach, that is they just don't listen when you talk reasonable so you get what we had here last week, which is the way he wants it, well he gets it, and I don't like it any better than you men."). The quotation was altered somewhat in the movie, where the Captain was played by Strother Martin (Warner Bros./Seven Arts 1967).

[2] The pleading signed by Mr. Brown's associate claimed that WMG misrepresented that Mr. Brown and/or Mr. Abrishamian evaded service, argued that WMG's assertion "must be viewed as knowingly false," alleged that the Motion contained "incomplete and misleading representations" that, combined with WMG's "history of fraud," compelled the imposition of sanctions, and concluded that WMG had committed "acts of breach and fraud." In his *pro se* motion, Mr. Abrishamian asserted that it was "crystal clear" that Mr. Brown was not representing him, and referred to WMG and its counsel's collective "deliberate and knowledgeable dissemination of falsehood" to that effect, in spite of the fact that Mr. Brown filed the same motion on his behalf that very day. His motion also claims WMG and its counsel "propagat[ed] falsehoods" about his evasion of service, and engaged in a "deliberate campaign to dissemination [sic] false information" about this evasion, citing also their collective attempts "to again craftily exact money from me which I do not owe."

3

The court vacated the Affidavit Judgment on November 14, 2011, and on December 12, 2011, Mr. Abrishamian filed a Counterclaim, also in district court. The Counterclaim alleged that WMG, through Dr. Macedo, had received payments from him to testify in the underlying personal injury litigation, but refused to do so. According to the Counterclaim, Dr. Macedo's refusal to testify rendered Mr. Abrishamian "unable to present $10,510.00 in medical bills and proof of injury" at trial (impliedly because the refusal came too late for Mr. Abrishamian to find or subpoena another witness to authenticate the bills). Mr. Abrishamian also alleged that Dr. Macedo had offered to tamper with a diagnostic study to make it show results more likely to yield a verdict in his favor at trial. Perhaps more importantly for our purposes, the Counterclaim also included a demand for a jury trial, which caused the case to be transferred to the Circuit Court for Montgomery County.

On January 25, 2012, Mr. Abrishamian filed a Motion for Order of Default (the "Default Motion") in the circuit court on the ground that WMG had not filed an Answer to the Counterclaim. On January 30, 2012, the court denied what it called "*Plaintiff's* Motion for Default" (emphasis added), reasoning that *Mr. Abrishamian* had already filed an Answer (in the "Order Denying Default"). The circuit court apparently mistook the Motion for Default as filed by *WMG*, and, we suspect, denied the motion based on Mr. Abrishamian's answer to the *original* Complaint. We discuss this order in greater detail below.[3]

_____

[3] The circuit court's confusion was understandable—at this point, the parties were filing motions and proposed orders quickly and furiously. The Counterclaim itself seems to

(continued...)

4

On January 31, 2012, WMG filed an Opposition to the Motion for Default (the "Opposition to Default Motion") (it presumably had not seen the court's order *denying* the Default Motion), along with an Answer to the Counterclaim. A brief respite of filings followed (and no request from Mr. Abrishamian for a clarification of the Order Denying Default). Then, on February 28, 2012, WMG moved to disqualify Mr. Brown pursuant to Maryland Rule 2-504 and Maryland Lawyer's Rule of Professional Conduct Rule 3.7 (the "Motion to Disqualify"). WMG argued that the core dispute in the case—whether Dr. Macedo agreed to serve as an expert witness—centered around a conversation between Dr. Macedo and Mr. Brown about whether Dr. Macedo had agreed unequivocally to testify. The court granted the Motion to Disqualify in an Order, dated March 29, 2012 (the "Disqualification Order"), that stated "that Edward J. Brown, Esquire, is DISQUALIFIED as counsel/attorney of record for [Mr. Abrishamian] in the above-captioned case." Mr. Brown viewed the Order as less than a total bar, however; a month later, on April 30, 2012, WMG moved to strike a notice of deposition (the "Motion to Strike Macedo Deposition"), that Mr. Brown had signed as counsel for Mr. Abrishamian and that purported to note Dr. Macedo's deposition.

---

[3](...continued)
have caused confusion—within that document, Mr. Abrishamian refers to himself as the "Plaintiff," the "Counter Plaintiff," and the "Defendant" (and also refers to WMG as the "Defendant," to add to the confusion).

After receiving the Motion to Strike Macedo Deposition, and at the request of WMG's counsel, the circuit court judge (not the one who ultimately presided at trial) called the parties in and held a hearing. The judge did not see the ambiguity that Mr. Brown had seen in his Disqualification Order:

THE COURT: What about my order is not clear?

MR. BROWN: Your honor—

THE COURT: You don't have to agree with it, but—

MR. BROWN: Right.

THE COURT: —it says you're out of the case.

MR. BROWN: Well, I don't think it does say that, your honor, and I heard—

THE COURT: Great.

MR. BROWN: Okay.

THE COURT: You're out of the case.

MR. BROWN: Well—

THE COURT: Do not do anything else as a lawyer in the case. My order said you are disqualified—

MR. BROWN: Okay.

THE COURT: —from acting as counsel in the case. You act as counsel at your peril. I don't want to pick up the phone.

MR. BROWN: May I just—

THE COURT: Please.

6

MR. BROWN:        Can—

THE COURT:        No, you're out.  You don't like it, take an appeal–

MR. BROWN:        I—

THE COURT:        When it's appealable.

MR. BROWN:        Okay, but can I just make a quick record, your honor, because—

THE COURT:        No. I'm going to actually deny you that. I signed the order. It says what it says. It is not vague. It is not ambiguous. Close the record.  You can—the record will reflect, I'm denying the right to argue *ad nauseam* and going over the same thing. If you act as a lawyer in the case again, I will seek guidance from the administrative judge. I don't want to do that. Thank you. You're done.

MR. BROWN:        May I cite one case?

THE COURT:        No.

The docket entry characterizes the court's ruling as a "partial" grant of the Motion to Strike Macedo Deposition, and the record contains no other reference to the remaining requests in that motion. On May 7, 2012, Mr. Abrishamian moved to reconsider what he referred to as the "May 3, 2012 Order" (the "Motion for Reconsideration"). But that "order," which issued from the bench, simply clarified the scope of the Disqualification Order that the court issued on March 29, 2012.   Mr. Abrishamian argued in the Motion for Reconsideration that the scope of the Court's ruling improperly barred Mr. Brown from serving as counsel in the *entire* case in the circuit court, when he believed it should only have

7

barred him from serving as counsel at trial. The court denied the Motion for Reconsideration on June 5, 2012.

Over the next several months, the parties filed various motions to quash, motions for postponement, and motions for attorneys' fees. And perhaps not surprisingly, efforts at alternative dispute resolution met with no success.

Prior to trial, WMG moved *in limine* to exclude any testimony by Mr. Abrishamian regarding his allegation in the Counterclaim that Dr. Macedo offered to "enhance" a brain imaging study. The court granted the motion "without prejudice," leaving open the possibility that Mr. Abrishamian could seek to introduce the testimony if the issue came up again once trial was underway. The court reasoned that even if it were true, the claim alleged a "prior bad act" that Maryland Rule 5-404 would exclude. The court also found that the substance of the conversation was not relevant:

> It strikes me that it is a prior bad act, wrongful conduct that did not actually induce your client to act. And it strikes me—again, it's been in a vacuum, *because we're not in the midst of the trial. This is partly why I'm saying you can raise it at an appropriate time outside the jury, with notice to us at the bench.* That strikes me that the prejudicial impact of that would be significant and heavily outweigh any probative value, since *I don't find that it has probative value.*

(Emphasis added.)

Mr. Abrishamian filed several other pre-trial motions as well, including a motion asking the court to take judicial notice, under Maryland Rule 5-201, of a number of "facts" that we list here, as he phrased them:

8

1)	Dr. Wells' bills were admitted in the tort trial after Dr. Wells appeared, and laid the required foundation via his testimony;

2)	Dr. Ammerman's bills were admitted in the tort trial after Dr. Ammerman appeared via video, and laid the required foundation via his testimony.

3)	Dr. Dombrowski's bills were admitted in the tort trial after Dr. Dombroswki laid the required foundation via his testimony;

4)	Defendants WMG and [Dr.] Macedo [actually Plaintiff/Counter-Defendants] maintained their first lawsuit against [Mr. Abrishamian] for more than four months after receipt of actual notice that the allege [sic] amount sought was false. See Exhibit A. [Exhibit A is the 15-page Answers to Interrogatories that WMG filed in discovery.]

5)	That, at the time of the institution of the first lawsuit, had the amount which [WMG and Dr. Macedo] ultimately admitted was at issue been the amount sought, the case would have been a small claims action, could not have been moved to the Circuit Court for Montgomery County, and no discovery could have occurred.

6)	The Law Office of Edward J. Brown did not institute the tort lawsuit, as sworn in Defendant's Affidavit.

7)	In WMG's s [sic] Answer to Interrogatory No. 3 in District Court, its representative, A. Bocian, admits that it was only possible that she, WMG's secretary, spoke to Defendant Brown ("I spoke to Brown's office and possibly Brown himself."). *See* Plaintiff's Answer to Interrogatory No.3, Ex.A. Bocian in her Motion for Summary Judgment Affidavit (Circuit Court 1), testifies under penalties of perjury that she spoke to Defendant Brown—not a "only possible" [sic] anymore, but now an unconditional, unequivocal, unqualified assertion that she herself spoke to attorney Brown.

9

8) a) Defendant [actually Plaintiff] WMG, in Answer to Interrogatories, swore under penalties of perjury that it was only AFTER Brown signed the A&A that the 11/10/2009 conversation with Dr. Macedo could, and did, go forward. *See* WMG's Answer to Interrogatory No.3, Ex.A.

b) It is undisputed that the date of the call was November 10, 2009.

c) Ms. Bocian in WMG's Affidavit in support of its Motion for Summary Judgment swore that Brown signed the A&A on November 11, 2009. See Exhibit B.

9) In the same Affidavit, Ms. Bocian swore that Brown was the person under whose "advisement (sic) that Abrishamian decided to pursue legal action against the third party tortfeasor". *See* Affidavit of Plaintiff's representative Bocian at paragraph 7, Ex. B. The Court docket discloses that the actions was instituted [sic] by completely unrelated counsel on May 29, 2008 (long before Brown's involvement over a year later—the Md. Judiciary Website identifies the date of Brown's appearance as June 26, 2009).

10) The applicable confidentiality provisions of Federal law (HIPPA) [sic].

In denying the motion, the court noted that Mr. Abrishamian had not offered the documents from other cases themselves, but had asked the court to endorse his descriptions, and the court "declin[ed] to take judicial notice of something that's no longer in the court record." At the same time, WMG told the court that it would seek attorneys' fees and pre-judgment interest from the court if it prevailed, not from the jury.

The case was tried to a jury on February 11-12, 2013. The jury returned a verdict in favor of WMG for $2,900.00. On April 18, 2013, the court granted WMG's petition for attorneys' fees in the amount of $965.70, and interest in the amount of $2,262.00.

10

Mr. Abrishamian filed a timely notice of appeal.

## II.  DISCUSSION

Mr. Abrishamian's list of appellate issues includes nearly every pre-trial decision the circuit court made.[4]  At the threshold, he argues that the Clerk of the Circuit Court erred in

---

[4] He presented to us the following questions:

A.   Did the circuit court err in failing to enter an order of default against [WMG], due to WMG's Failure to file a timely answer, which would have avoided the need for [Mr. Abrishamian's] counsel of choice to have been exposed to a motion to disqualify?

B.   Did the circuit court err in ruling that [Mr. Abrishamian's] counsel of choice could not serve as counsel in non-trial matters, including hearings and discovery, and in preventing [Mr. Abrishamian] from performing discovery due to this erroneous? [sic]

C.   Did the circuit court err in disqualifying [Mr. Abrishamian's] counsel of choice *without a hearing*, and thus never evaluating the applicable factors, including waiver and the substantial hardship that recusal, particularly at the late stage the challenge was raised, would inflict upon [Mr. Abrishamian]?

D.   Did the circuit court err in applying a prior bad acts rationale in a civil case, and incorrectly excluded [sic] evidence that [Dr. Macedo] tampered with an imaging study taken of [Mr. Abrishamian]?

E.   Did the circuit court err in granting attorney's fees, as [WMG's] failure to petition for contract-based fees before judgment was entered terminated the claim?

F.   Did the circuit court err in assessing interest, as [WMG's]

(continued...)

11

failing to enter a default and that that error alone entitles him to victory. From there, he challenges the circuit court's decision to disqualify his counsel (who, with our permission, briefed and argued the appeal), a variety of evidentiary rulings, and the court's decisions regarding interest and attorneys' fees. After sifting through the rhetoric and overstated allegations of fraud, we find no errors.

### A. The Circuit Court Did Not "Err in Failing To Enter An Order Of Default Against WMG."

Maryland Rule 2-613 provides that "[i]f the time for pleading has expired and as provided by these rules, the court, on written request of the plaintiff, shall enter an order of default." Md. Rule 2-613(b). The Rule then requires the Clerk to issue a notice of default to the defendant, who may file a motion within thirty days asking the court to vacate the order. Md. Rule 2-613(c). The motion to vacate must "state the reasons for the failure to plead and the legal and factual basis for the defense to the claim." Md. Rule 2-613(d). Importantly, and in light of the overarching preference that judgments reflect the merits of a dispute rather than procedural "gotcha" victories, the court *must* vacate the default if it

---

[4](...continued)
> failure to petition for contract-based interest before judgment was entered terminated the claim, and given that the jury's award may have already included the interest?

G. Did the trial court err in not taking judicial notice of key facts from the first lawsuit, which prejudiced [Mr. Abrishamian] as this was the only way these facts could be presented[?]

12

"finds that there is a substantial and sufficient basis for an actual controversy as to the merits of the action and that it is equitable to excuse the failure to plead." Md. Rule 2-613(e).

Mr. Abrishamian contends that the circuit court was *required* to enter an order of default against WMG on his Counterclaim (there is no issue of default regarding WMG's claims against him, so nothing in this section relates at all to the jury verdict or ensuing judgment) thirty days after he filed the Default Motion. He is right on that discrete point. From there, though, he contends that judgment in his favor would have followed inexorably from an order of default. That leap in logic encounters insurmountable hurdles.

Had the Clerk entered an order of default, the next step would not have been a judgment on the Counterclaim, but notice to WMG and a thirty-day opportunity to file a motion to vacate the entry of default. And it seems to follow, based on the actual progression of events, that WMG would have filed such a motion, made the arguments it raised (successfully) in the Opposition to Default Motion, and that Mr. Abrishamian would have opposed such a motion with the arguments it made in the Default Motion. Put another way, it is clear that WMG would not have conceded the merits of the Counterclaim (because it fought them), and the circuit court in fact considered and decided the same issues and arguments an order of default would have placed before it, even if somewhat later in the life of the case. Faced with the same questions, albeit on an inverted posture, we are comfortable that the circuit court would have vacated an order of default under Rule 2-613(c), just as it

13

declined to impose a default later, and that the Clerk's ministerial error did not prejudice Mr. Abrishamian.

Although Mr. Abrishamian argues that we must review the Order Denying Default *de novo*, we are persuaded that the more appropriate standard is the one we apply when default has been entered and the circuit court is asked to vacate it. Under those circumstances, the court has broad discretion, which "'must be exercised liberally, lest technicality triumph over justice.'" *Holly Hall Publ'ns, Inc. v. Cnty. Banking & Trust Co.*, 147 Md. App. 251, 262 (2002) (quoting *Royal Ins. Co. of America v. Miles & Stockbridge, P.C.*, 133 F. Supp.2d 747, 768 (D. Md. 2001)). We reviewed the standard in detail in *Holly Hall*, where the trial court refused to vacate an entry of default. Although the trial court in that case entered default against a defendant in an original claim and not a counterclaim, the circumstances otherwise were similar—the complaint related to previously filed actions, counsel for the parties had a tense working relationship, and the parties already were litigating a separate but related action. *Id.* at 254. Counsel had an answer prepared, but, as he explained in a motion to strike the order of default, he held the answer while the parties discussed the possibility of settlement, then mistakenly failed to file it when the parties broke off those discussions. *Id.* at 255-56. The court declined to grant the defendant's motion to strike the entry of default, a decision the defendant appealed.

We discussed both facets of Rule 2-613(e) in *Holly Hall*. *First*, we addressed the requirement that a party show a "substantial and sufficient basis for a controversy as to the

14

merits," and explained that "[a] conclusory statement that merely tracks the language of the rule is insufficient." *Holly Hall*, 147 Md. App. at 260. *Second*, we examined in depth the Rule's requirement that the court consider whether "it is equitable to excuse the failure to plead," noting at the outset the "broad general discretion" of the trial court and the purpose of the rule in Maryland, which is "not punitive in nature." *Id.* at 261-62. We emphasized that the goal of the rule is "to ensure that justice is done[, which] requires consideration of all relevant circumstances in any given case." *Id.* at 265. We noted further that "[t]echnicality, while important, should not be elevated to an exalted status." *Id.* at 266. And we ultimately held that the trial court abused its discretion when it denied the motion to vacate, because the defendant had demonstrated the "basis for an actual controversy," *id.* at 260, and counsel's failure to file the answer came not from any ill-will or contumacious behavior, but from inadvertence. *Id.* at 267. We added too that the motion to vacate came right after entry of the Order, so "there was no continuing pattern of neglect," nor any suggestion of harm to the appellee. *Id.*

In this case, we recognize that the Opposition to Default Motion didn't address whether WMG had a meritorious defense. But technically it didn't have to, because it wasn't styled as a Rule 2-613 motion in the first place—WMG wasn't aware that the court had issued the Order Denying Default, so it opposed the Default Motion generally rather than addressing the specific requirements under Rule 2-613(c). But as we look back at the circuit

15

court record, the answer to the question of whether WMG had a meritorious defense is obvious—WMG prevailed at trial when the court granted its motion to dismiss.[5]

As to the *second* prong of the *Holly Hall* analysis, WMG's explanation for failing to answer tracks the argument that succeeded in *Holly Hall*. WMG's original attorney had left his law firm in August 2011, when Mr. Abrishamian filed the Counterclaim, and through inadvertence (or at worst, benign neglect), the answer to the Counterclaim slipped through the cracks. But WMG opposed the Default Motion within six days of filing (even though it had already been denied), within two months after Mr. Abrishamian filed the Counterclaim, and filed its Answer the same day.

*Finally*, we disagree that Mr. Abrishamian suffered any harm from the court's denial of the Default Motion. We see no connection between the Clerk's error in not entering an order of default on the counterclaim and the disqualification of his counsel, which arose (as we discuss in greater detail below) because counsel testified as part of Mr. Abrishamian's defenses to *WMG's claims* (and thus beyond the scope of the potential default). Rather than pressing for an order of default well before trial, Mr. Abrishamian proceeded with discovery and the remainder of the litigation, effectively acting as if the court had denied the Default

_____

[5] Although Mr. Abrishamian attacks the lack of defenses WMG raised *at that time* and claims we can't rely on the fact that WMG ultimately prevailed on the Counterclaim, we decline to ignore reality. And in any event, Mr. Abrishamian conducted himself throughout the pre-trial phase of the case as if default had been *denied*—he moved forward with discovery and trial and only raised the issue again on the morning of trial, when the court properly denied his motion for default based on WMG's filing of an answer and the fact that "the parties are aware that [WMG] is not admitting fraud."

16

Motion. We decline to reward Mr. Abrishamian's decision to wait until the morning of trial to demand a default, a litigation tactic that would subvert the recognized goal of "'conform[ing] to principles of justice and right'" that we espoused in *Holly Hall*. 147 Md. App. at 265 (quoting *Black's Law Dictionary* 558 (7th ed. 1999)).

### B. The Circuit Court Properly Disqualified Counsel.

Mr. Abrishamian next challenges the trial court's decision to disqualify Mr. Brown as his counsel. He argues *first* that the court erred in failing to convene a hearing on the question, and contends that if it had, the court surely would have agreed with his position that Mr. Brown should continue as his counsel. *Second,* he claims that the scope of disqualification was too broad and that the court should have permitted Mr. Brown to continue representing him in non-trial matters. WMG counters that the circuit court properly disqualified Mr. Brown because his role as fact witness mandated his absence from the trial table—and from all other aspects of the case, including discovery—under Maryland Rules of Professional Conduct, Rule 3.7(a). Under these circumstances, we agree with WMG.

The governing ethical rule precludes lawyers from serving both as counsel and a witness in a case, save for three narrow circumstances:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or

17

> (3) disqualification of the lawyer would work substantial hardship on the client.

Md. Rule 16-812, Rules of Prof. Conduct, Rule 3.7(a).

Mr. Brown argues that *State v. Goldsberry*, 419 Md. 100 (2011), required the circuit court to hold "an evidentiary hearing . . . if the Court was even contemplating granting the Motion [to Disqualify]." We disagree. *First*, *Goldsberry* is a criminal case that turns on a Sixth Amendment deprivation that obviously is not at issue here. *See id.* at 132 (the trial court's "failure to develop a factual record . . . denied Goldsberry his Sixth Amendment right to counsel of his choice."). Mr. Abrishamian enjoys no such constitutional right to counsel, and he suffered no Constitutional prejudice when the circuit court disqualified his counsel without a hearing.[6]

*Second*, we do not see how Mr. Brown could have avoided disqualification in any event. His credibility has always been a core issue in this case: Mr. Abrishamian claimed out of the gate that Dr. Macedo lied *to Mr. Brown* about whether he planned to testify in Mr.

_____

[6] WMG filed the Motion to Disqualify on February 28, 2012, and Mr. Abrishamian opposed it on March 19, 2012. Even allowing for fifteen days to respond under Rule 2-311, and allowing for three days mailing under Rule 1-203(c), it appears the Opposition was filed one day late. We don't rely on the untimeliness of Mr. Abrishamian's filing as a basis for our holding, however, because the trial court was correct on the merits. And although Mr. Abrishamian refers to the Motion for Reconsideration of the "May 3 Order," he actually misunderstands that the March 29, 2012 Disqualification Order is what's at issue here; the court made abundantly clear from the bench on May 3 the scope of its *initial* March 29, 2012 Disqualification Order, but his Motion to Reconsider what he characterizes as a May 3 Order did not entitle him to a hearing or any further explanation from the trial judge. *Lowman v. Consol. Rail Corp.*, 68 Md. App. 64, 77 (1986) ("Rule 2–311(f) does not require the court to grant a request for a hearing on a motion to reconsider.").

18

Abrishamian's personal injury trial. Mr. Brown testified at trial about conversations he had not only with Mr. Abrishamian and Dr. Macedo, but also with Alex Bocian, who worked at Dr. Macedo's office. Mr. Brown's substantive centrality to the issues in the case should have compelled him to back out at the beginning, and the timing of the Motion to Disqualify doesn't really matter. *See Klupt v. Krongard*, 126 Md. App. 179, 207 (1999) ("When the attorney in question is so clearly aware before the fact of the potential conflict between his roles as advocate and witness, then the scrutiny usually applied to an opposing party's motion for disqualification is unnecessary, and the burden shifts to the attorney in question."). Moreover, Mr. Abrishamian had more than enough time before trial to secure other counsel, and he did so.

*Last*, we disagree with Mr. Abrishamian's assertion that Mr. Brown should have been permitted to participate in all stages of the litigation other than the trial. He overreads a passing footnote in *Klupt*, in which we affirmed the trial court's disqualification of the appellant's counsel even as the appellant offered to waive the conflict that formed the basis of the court's decision. The appellant in *Klupt* raised the question of whether the attorney who had been disqualified should have participated in that pending *appeal*. We explained that "[t]he [trial] court's order of disqualification is not explicit on the question of whether [counsel] was disqualified from representing the appellants at trial or from any *further participation* in this case." *Id.* at 211 n.6 (emphasis added). That's all we said: the footnote did not suggest that any sort of piecemeal disqualification at the trial level would have been

19

appropriate, but simply compared involvement at the *trial* level with involvement at the *appellate* level. Disqualification of counsel at the trial level can extend to any aspect of the litigation the circuit court deems appropriate under the circumstances, and the circuit court properly prohibited Mr. Brown's involvement in discovery as well as at trial in this case.

### C. The Circuit Court Properly Excluded Mr. Abrishamian's Testimony About The "Enhanced" EMG Study.

Mr. Abrishamian *next* argues that the trial court should have permitted him to testify that Dr. Macedo offered to "enhance" a diagnostic imaging test, ostensibly to increase his potential damages in the auto tort trial. WMG responds that the testimony would have admitted inadmissible information about alleged prior bad acts, and the trial court also barred it (properly) as unduly prejudicial. The trial court granted WMG's Motion *in Limine*, but did so *without prejudice* and on several different grounds:

> It strikes me that it is a prior bad act, wrongful conduct that did not actually induce your client to act. And it strikes me—again, it's been in a vacuum, because we're not in the midst of the trial. This is partly why I'm saying *you can raise it at an appropriate time outside the jury*, with notice to us at the bench. That strikes me that the prejudicial impact of that would be significant and heavily outweigh any probative value, since *I don't find that it has probative value*. Now, in the context of the trial, maybe it will have a different appearance. But right now, I think it's just a prior bad act. It's generally not admissible and doesn't fit within [an] exception to that rule. *So, I guess you could say the motion's granted without prejudice*.

(Emphasis added.)

20

We review a trial court's decision to admit or exclude evidence based on relevance for an abuse of discretion. *Fenner v. State*, 381 Md. 1, 25 (2004). We disagree with WMG in one regard: Dr. Macedo's offer (assuming its truth for present purposes only, and making no judgment as to its veracity) could not have been precluded as a prior bad act, because Rule 5-404(b) relates only to criminal proceedings. *See Ruffin Hotel Corp. of Md. v. Gasper*, 418 Md. 594, 625 (2011). But the trial court acted within its discretion in deeming the testimony both irrelevant and prejudicial, and we affirm its decision on that ground.

Maryland Rule 5-401 defines relevant evidence as evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. Rule 5-403 permits exclusion of some relevant evidence nonetheless: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Md. Rule 5-403.

*First*, we agree with the trial court's assessment that this evidence was not relevant. It had nothing to do with the contract claim or the disputes of fact between Mr. Abrishamian and Dr. Macedo. Even though Mr. Abrishamian perceived a "pattern" of fraud on Dr. Macedo's part, absolutely no evidence supported that claim. *Second*, even if relevant, evidence about this conversation would have caused prejudice that outweighed any probative value. *See Alban v. Fiels*, 210 Md. App. 1, 23 (2013) (where plaintiff offered testimony in

21

hit-and-run trial that defendant drove off smirking after causing the accident, trial court "could have reasonably concluded that the introduction of the disputed testimony would have been unduly prejudicial"). We also note that Mr. Abrishamian cited no cases relating to the relevance/probative value argument, which consumes all of two paragraphs in his brief. *Van Meter v. State*, 30 Md. App. 406, 408 (1976) ("[I]issues can be waived for failure to comply with the procedural requirements to preserve the right of appellate review.")

*Finally*, although WMG didn't raise this argument, we note that Mr. Abrishamian waived his right to press this issue on appeal. When he first argued this point in the course of WMG's Motion *in Limine*, the court ruled *in favor of WMG, without prejudice*, and told counsel for Mr. Abrishamian that he could raise the matter during trial "at an appropriate time outside the jury." But through the course of Mr. Abrishamian's testimony, when counsel had the chance to elicit testimony from him about the alleged conversation, counsel never did so, leaving us with no decision of the circuit court to review.

### D. The Circuit Court Properly Awarded Pre-Judgment Interest And Attorneys' Fees After Entry Of The Verdict.

Mr. Abrishamian appears to make the same argument with respect to both pre-judgment interest and attorneys' fees, *i.e.*, that the court should not have permitted WMG to submit them after the jury reached its verdict. The issues are separate, but the outcome is the same for both: Mr. Abrishamian failed to preserve the issue for review.

Prior to trial, counsel for WMG told the court that he wanted to petition the court for attorneys' fees and pre-judgment interest *after* the jury returned a verdict. He explained his rationale about the pre-judgment interest:

> [COUNSEL FOR WMG]: There's—the contract between Mr. Abrishamian and [WMG] provides for interest on the unpaid bill. We have a calculation. I'd rather just let you rule on that, assuming that we prevail, afterwards, rather than give it to the jury to try to figure out—
>
> THE COURT: Isn't pre-judgment interest a discretionary matter with the court?
>
> [COUNSEL FOR MR. ABRISHAMIAN]: Yes. I mean, I was—
>
> THE COURT: Opposed to a jury?
>
> [COUNSEL FOR MR. ABRISHAMIAN]: —it—I wasn't raising that, but I believe it's 2 percent in the contract.
>
> [COUNSEL FOR WMG]: Yeah. So I think I should present that to you as well, after the trial—
>
> THE COURT: All right. I—
>
> [COUNSEL FOR WMG]: —assuming—
>
> THE COURT: *I would think so, too, unless you want to argue that point.*
>
> [COUNSEL FOR MR. ABRISHAMIAN]: *No.*

(Emphasis added.)

In the course of the court's review of proposed jury instructions and the verdict sheet, both the court and counsel for WMG referred to the fact that attorneys' fees would not be

23

addressed in the verdict sheet. (From the trial court: "Attorneys' fees, damages is out." Then, from counsel for WMG: "[W]e've agreed already that we're going to submit the attorneys' fees to the court after trial anyway.") Counsel for Mr. Abrishamian said nothing at the time, and impliedly acceded in the court's treatment as to fees as well. *See Van Meter*, 30 Md. App. at 408 ("[I]issues can be waived for failure to comply with the procedural requirements to preserve the right of appellate review."); *see also* Md. Rule 8-131(a) ("Ordinarily, the appellate court will not decide any . . . issue unless it plainly appears by the record to have been raised in or decided by the trial court."); *Halloran v. Montgomery Cnty. Dep't of Pub. Works*, 185 Md. App. 171, 201 (2009) (noting that Rule 8-131(a) "arises from the principle that '[w]hen a party has the option either to object or not to object, his failure to exercise the option while it is still within the power of the trial court to correct the error is regarded as a waiver of it estopping him from obtaining a review of the point or question on appeal'" (quoting *Basoff v. State,* 208 Md. 643, 650 (1956)).

**E.     The Trial Court Properly Declined To Take Judicial Notice
Of The Information Mr. Abrishamian Submitted.**

Mr. Abrishamian argues *last* that the circuit court should have taken judicial notice of certain information under Rule 5-201, which provides that upon a party's request, the court *must* take judicial notice of "adjudicative facts." WMG argues that the court properly declined to take judicial notice because the "facts" Mr. Abrishamian referred to were not contained in any court record and did not constitute "adjudicative facts." We agree with

24

WMG—the trial court properly exercised its discretion not to take judicial notice of these non-adjudicative and highly disputed "facts."

Rule 5-201 describes the kinds of facts that properly are subject to judicial notice:

> A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

Md. Rule 5-201. We review the trial court's decision under the "clearly erroneous" standard, keeping in mind "[t]he principle that there is a legitimate range within which notice may be taken or declined and that there is efficacy in taking it, when appropriate." *Smith v. Hearst Corp.*, 48 Md. App. 135, 141 (1981).

Trial courts can take judicial notice of "matters of common knowledge or [those] capable of certain verification." *Faya v. Almaraz*, 329 Md. 435, 444 (1993); *see also Dashiell v. Meeks*, 396 Md. 149, 174-76 (2006) (holding that appellate court may take judicial notice of adjudicative facts at its discretion). We have distinguished "adjudicative facts" from "legislative facts" by defining the former as facts "'about the parties and their activities, businesses and properties. They usually answer the questions of who did what, where, when, how, why, with what motive or intent.'" *Dashiell*, 396 Md. at 175 n.6 (quoting *Montgomery County v. Woodward & Lothrop, Inc.*, 280 Md. 686 (1977)); *Irby v. State*, 66 Md. App. 580, 586 (1986) ("The doctrine of judicial notice substitutes for formal proof of a fact 'when formal proof is clearly unnecessary to enhance [the accuracy of] the fact finding

25

process.'" (quoting *Hearst Corp.*, 48 Md. App. at 136)). Many different types of information can fall under the umbrella of judicial notice, most commonly public records such as court documents, *see Marks v. Criminal Injuries Comp. Bd.*, 196 Md. App. 37, 78 (2010), or facts that are widely known (often within the particular geographic area where a case is pending). *See, e.g.*, *Dean v. State*, 205 Md. 274, 280-81 (1954) (taking judicial notice that certain streets were within a particular city's borders, thus allowing a trial judge to determine that crimes were committed within the jurisdiction); *see also Hearst Corp.*, 48 Md. App. at 140-41 (permitting trial court to take judicial notice of the fact that a local newspaper was owned by a particular corporation). And the categories of adjudicative facts susceptible to judicial notice run the gamut, from public records, *see Marks*, 196 Md. App. at 79 n.7 (judicially noticing that the Administrative Office of the Courts makes Maryland Judiciary records available on the Judiciary's website), to medical, *see Schultz v. State*, 106 Md. App. 145, 173 (1995) (taking judicial notice of reliability of ophthalmological test, if properly administered), to forensic, *see Eley v. State*, 288 Md. 548, 553-54 (1980) ("This Court has taken judicial notice of the high degree of reliability accorded to [fingerprint] identification."), to geographic, *see Iozzi v. State*, 224 Md. 42, 44 (1960) ("[G]eographical facts of a local nature may be judicially noticed by a trial court to establish venue. This is particularly true as to the location of towns within a particular county where the court sits." (citations omitted)), to behavioral. *See Pettit v. Erie Ins. Exch.*, 117 Md. App. 212, 228 (1997), *aff'd*, 349 Md. 777 (1998) (taking "judicial notice of the definition of pedophile

provided in Diagnostic Statistical Manual IV (DSM–IV), a publication of the American Psychiatric Association" (citations omitted)).

What unites these various classes of information is not so much their nature as public or widely-known, but more their nature as *undisputed*—as one commentator has described it, falling into either the "everybody around here knows that" category, or the "look it up" category. *See* Lynn McLain, Maryland Evidence, State & Federal § 201:4(b)-(c), at 221, 237 (3rd ed. 2013).  Put another way, "[i]f there is no reason to waste time proving a fact, it can be 'judicially noted.'"  Joseph Murphy, Maryland Evidence Handbook § 1000, at 489 (4th ed. 2010).  But the doctrine does not typically extend to facts relating *specifically* to the parties involved.  *See, e.g.*, *Walker v. D'Alesandro*, 212 Md. 163, 169 (1957) (finding error where trial court took judicial notice that defendant had taken certain actions in his official capacity as mayor of the City of Baltimore).

Mr. Abrishamian's requests for judicial notice (which we reproduced above in Part I as he recounted them in his motion) all relate to facts still in dispute in this case:

- Mr. Abrishamian's medical bills (Dr. Wells, Dr. Ammerman, and Dr. Dombrowski);

- The *nature of* pleadings and discovery responses in this case, both in the circuit court and in the district court below (for example, that WMG maintained its original lawsuit for more than four months after it realized that the $11,000 damages claim was "false," and that if the proper amount had been pled the case would have remained in district court);

- The truth *vel non* of certain facts in the litigation (for example, that WMG's employee Alex Bocian would have to have been the person there to speak with Mr. Brown about the litigation); and last,

- "The applicable confidentiality provisions of Federal law (HIPPA [sic])."

None of these categories describes information that a court could notice judicially. The parties conceivably could have stipulated to the authenticity of the documents in the *first* category (medical bills), although we don't mean to suggest WMG necessarily had to. The documents at issue, however, don't contain medical *facts* susceptible to judicial notice—they are the medical bills that form the basis of WMG's claims in this case. *Compare Kassama v. Magat*, 368 Md. 113, 119 n.5 (2002) (holding that the fact that the normal term of human pregnancy is 38 weeks was properly the subject of judicial notice).

As to the *second* category, we agree with the trial court that it could not take judicial notice of pleadings not in the record. *See In re Nathaniel A.*, 160 Md. App. 581, 598 (2005) (holding that trial court properly took judicial notice of pleadings in prior CINA determination where the pleadings were entered into evidence at the later proceeding). *But see Cochran v. Griffith Energy Servs., Inc.*, 426 Md. 134, 145 n.4 (2012) (taking judicial notice on appellate review of the contents of filings in a prior lawsuit, based on the fact that both parties agreed at oral argument that they had relevance to the appeal, and the court concluded that a "just result" would be reached by considering them). Moreover, Mr. Abrishamian wasn't simply asking the court to notice judicially the *existence* of the pleadings—he wanted the court to assume the truth of the assertions within those pleadings.

28

Noticing pleadings does *not* mean accepting what they say as true, only that they exist as public records. *See Lerner v. Lerner Corp.*, 132 Md. App. 32, 41 (2000) (taking judicial notice of an order and notice of judgment entered in the circuit court, but not, for example, of a party's offer to sell stock). The truth or falsity of the arguments remained for the court to decide.

In the *third* category, Mr. Abrishamian asked the court to notice facts that not only were in dispute, but that lay at the center of his claim. And for good measure, these disputed facts (like those in the first two categories) related specifically to this litigation and would not have been judicially noticed in the first instance. *See Walker*, 212 Md. at 169 (permitting trial court to take judicial notice that the defendant *was* the Mayor of Baltimore City, but finding error in its taking judicial notice that he *was acting in his official capacity* with respect to the underlying claims).

Mr. Abrishamian's *last* request, that the trial court judicially notice "HIPPA [sic] regulations,"[7] could conceivably fall under Md. Code (2006, 2013 Repl. Vol.), § 10-501 of the Courts and Judicial Proceedings Article, which mandates that the courts "shall take judicial notice of the . . . statutes of every state, territory, and other jurisdiction of the United States." But he never invoked this statute as a basis to introduce the applicable regulations in the first place—he asked the court generically to take notice of "[t]he applicable

---

[7] We assume he means to refer to the Health Insurance Portability and Accountability Act, Pub. L. No. 104–191, 110 Stat.1936 (1996), which governs privacy of medical records.

confidentiality provisions of Federal law (HIPPA)," with no useful citation to a particular provision or group of provisions. Moreover, he does not raise this provision again on appeal or argue that the court erred by declining to take judicial notice of it, and thus has waived the right to raise it on appeal.

**JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**